UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X   Case No. 12 cv 1484
ANAND DASRATH,

                                Plaintiff,                               **AMENDED COMPLAINT**

            - against -

STONY BROOK UNIVERSITY MEDICAL CENTER,      **PLAINTIFF DEMANDS**
PETER GIACOPELLI, *Individually*, KARL VON BRAUN,   **A TRIAL BY JURY**
*Individually*, and JEANNENE STRIANSE, *Individually*,

                               Defendants.
------------------------------------------------------------------------X

Plaintiff, ANAND DASRATH, by his attorneys, PHILLIPS & PHILLIPS, Attorneys at Law, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII") and the <u>New York State Human Rights Law</u>, New York State Executive Law §296 *et. seq.* ("NYSHRL")*,* and seeks damages to redress the injuries Plaintiff has suffered as a result of being **Discriminated against** on the basis of his **National Origin (Guyanese)**, **Race (East Indian)**, and **Terminated** by his employer solely **In Retaliation** for complaining of discrimination.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over the claims of Plaintiff brought under state law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), as the acts complained of occurred within the Eastern District of New York.

## PROCEDURAL PREREQUISITES

5. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

6. Plaintiff received a Notice of Right to Sue from the EEOC, dated December 29, 2011, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

7. This Action was commenced within 90 days of receipt of said Right to Sue.

## PARTIES

8. That at all times relevant hereto, Plaintiff ANAND DASRATH ("DASRATH") is a resident of the State of New York and County of Queens.

9. That at all times relevant hereto, Defendant STONY BROOK UNIVERSITY MEDICAL CENTER ("STONY BROOK") is a municipal corporation, duly existing pursuant to, and by virtue of, the laws of the State of New York, with its principal place of business located at 101 Nicolls Road, Stony Brook, New York 11794.

10. That at all times relevant hereto, Plaintiff DASRATH was a full-time employee of Defendant STONY BROOK.

11. That at all times relevant hereto, Defendant PETER GIACOPELLI ("GIACOPELLI") was an employee of Defendant STONY BROOK, holding the position of "Pharmacy

2

Supervisor."

12. That at all times relevant hereto, Defendant GIACOPELLI was Plaintiff DASRATH's supervisor and had supervisory authority over Plaintiff DASRATH.

13. That at all times relevant hereto, Defendant KARL VON BRAUN ("VON BRAUN") was an employee of Defendant STONY BROOK, holding the position of "Pharmacy Supervisor."

14. That at all times relevant hereto, Defendant VON BRAUN was Plaintiff DASRATH's supervisor and had supervisory authority over Plaintiff DASRATH.

15. That at all times relevant hereto, Defendant JEANNENE STRIANSE ("STRIANSE") was an employee of Defendant STONY BROOK, holding the position of "Director of Pharmacy."

16. That at all times relevant hereto, Defendant STRIANSE was Plaintiff DASRATH's supervisor and had supervisory authority over Plaintiff DASRATH.

17. That at all times relevant hereto, Defendant STONY BROOK, Defendant GIACOPELLI, Defendant VON BRAUN, and Defendant STRIANSE are collectively referred to herein as "Defendants."

## MATERIAL FACTS

18. On or about October 5, 2006, Plaintiff DASRATH began working for Defendants as a "TH Pharmacist" in Defendant STONY BROOK's Pharmacy Department, earning approximately $105,500.00 per year.

19. Throughout his tenure with Defendants, Plaintiff DASRATH was an exemplary employee, always received compliments for his work performance, and got along well

3

with all of his co-workers.

20. In fact, on or about October 17, 2008, Plaintiff DASRATH received an exceptional performance evaluation and was given the highest marks in almost all of the categories in which he was evaluated.

21. Furthermore, throughout his tenure, Plaintiff DASRATH received several pay raises, ultimately receiving a salary of approximately $131,000.00 per year.

22. However, also throughout his employment, **Defendants also subjected Plaintiff DASRATH to harassment and discrimination based on his race (East Indian) and national origin (Guyanese)**, and then terminated Plaintiff DASRATH's employment in retaliation for complaining of the unlawful harassment and discrimination.

23. Defendant GIACOPELLI would constantly make discriminatory and derogatory comments about the people of Guyana, saying that "**Guyanese people were all Bucks who did not wear clothes,**" "**did not conduct marriage ceremonies,**" "**did not have any formal education,**" and that "**all Guyanese men would make babies and leave the scene**." Plaintiff DASRATH was extremely offended and disgusted by these obviously discriminatory and unlawful comments.

24. In addition, Defendant GIACOPELLI always seemed upset and aggravated that someone from Guyana was employed as a Pharmacist, and when Plaintiff DASRATH told Defendant GIACOPELLI that he attended the same pharmacy school as Defendant GIACOPELLI, and even obtained a Master's Degree in Pharmacology/Toxicology, Defendant GIACOPELLI seemed very disappointed. Defendant GIACOPELLI always seems to harbor hate and jealousy against Plaintiff DASRATH.

25. In or about early 2007, although Defendant GIACOPELLI knew that Plaintiff DASRATH

25. was a Pharmacist working in the intravenous-admixture room, in an attempt to put Plaintiff DASRATH in his place, Defendant GIACOPELLI suddenly whipped out a one dollar bill, handed it to Plaintiff DASRATH, and ordered him to go and get him a cup of coffee, stating, **"You foreigners create a lot of problems in our country."**

26. Furthermore, on repeated occasions, Defendant GIACOPELLI stated, **"I did not think that people from the jungles of Guyana were capable of working in a responsible job as an I.V. pharmacist.  I don't think he belongs here,"** referring to Plaintiff DASRATH.

27. On another occasion while referring to Plaintiff DASRATH, Defendant GIACOPELLI stated, **"I can step on him like a cockroach."**

28. Moreover, on a number of occasions, while Plaintiff DASRATH was eating his home-cooked meal in Defendants' "lunch room," Defendant GIACOPELLI would always ask, **"Is that jaguar meat you are eating?  Did you kill the poor jaguar and eat its meat?"**

29. On or about October 9, 2009, **Plaintiff DASRATH complained to Defendant STRIANSE** about Defendant GIACOPELLI's discrimination based on Plaintiff DASRATH's race and national origin, including documenting Plaintiff DASRATH as late for work even though he was not late and accusing Plaintiff DASRATH of eating jaguar meat.  Shockingly, rather than addressing Plaintiff DASRATH's serious allegations, Defendant STRIANCE instead called Plaintiff DASRATH violent, insubordinate, and even used racial slurs against him.

30. Throughout Plaintiff DASRATH's employment, Defendants also continuously subjected Plaintiff DASRATH to disparate treatment due solely to his race and national origin.

31. By way of example, while Defendants assigned Plaintiff DASRATH to work the

5

weekend evening shift, from 6:00 p.m. to 7:30 a.m., every Friday, Saturday and Sunday night, Defendants did not assign any Caucasian Pharmacist to work consecutive weekends.

32. Furthermore, although Defendants always gave Pharmacists who worked weekend night shifts a pay differential to compensate them at an hourly rate that exceeded their base hourly rate, Defendants never paid Plaintiff DASRATH this differential and, upon information and belief, **Plaintiff DASRATH was the only employee who worked weekend evenings who did not receive this pay differential**.  Upon information and belief, all of the other Pharmacists who received pay differentials were Caucasian.

33. Moreover, at the end of each calendar year, upon information and belief, even though Defendants awarded all non-Guyanese Pharmacists a bonus of one (1) to three (3) thousand dollars and then awarded salary increases for the following year in an amount equal to their bonus, **Defendants arbitrarily neglected to give Plaintiff DASRATH a bonus and/or salary increase for the year 2010**.  Upon information and belief, all of the Caucasian Pharmacists were awarded bonuses and salary increases.

34. Also, during all of Plaintiff DASRATH's shifts, Defendants only allowed Plaintiff DASRATH to perform intravenous fluid preparations, while all other Pharmacists were assigned this difficult work for only portions of their shifts.  Upon information and belief, all of the Pharmacists permitted to perform intravenous fluid work for a portion of their shift, rather than for its entirety, were Caucasian.

35. **Additionally, during Plaintiff DASRATH's employment, Defendant GIACOPELLI intentionally engaged in many acts of workplace sabotage directed towards only Plaintiff DASRATH, all in an attempt to set Plaintiff DASRATH up for failure**

6

**which he can then use an excuse to justify an otherwise unlawful termination.**

36. For example, Defendant GIACOPELLI would frequently sign Plaintiff DASRATH in as late, despite the fact that Plaintiff DASRATH had arrived at work on time, solely in an attempt to have him disciplined, about which Plaintiff DASRATH complained to his direct supervisor, John Farrell, Defendants' Pharmacy Administrator.

37. Even more preposterous, Plaintiff DASRATH even observed Defendant GIACOPELLI switching tuberculin syringes that Plaintiff DASRATH had prepared for patients, as well as taking sterile intravenous solutions that Plaintiff DASRATH had prepared and tampering with them again in an attempt to have Plaintiff DASRATH disciplined.

38. Furthermore, whenever Plaintiff DASRATH shared work related information with Defendant GIACOPELLI, he did not accept the information as authentic.  For example, when Plaintiff DASRATH informed Defendant GIACOPELLI that the intra-venous Bactrim admixture that Defendant VON BRAUN had compounded was expired, he did not believe Plaintiff DASRATH because the expiration date that Defendant VON BRAUN had placed on the label indicated that it was not expired.

39. On or about April 9, 2010, Defendant GIACOPELLI and Defendant VON BRAUN summoned Plaintiff DASRATH into a meeting, during which Defendant GIACOPELLI presented Plaintiff DASRATH with only the front page of Defendants' multi-page Performance Evaluation form, and told Plaintiff DASRATH to sign, which he refused.

40. Defendant VON BRAUN then attempted to prevent Plaintiff DASRATH from exiting the room, by closing and blocking the only exit door, until he signed the front page of the form. **Suspiciously, at no time in the course of the meeting was Plaintiff DASRATH presented with a full Performance Evaluation form**.

41. As such, also on or about April 9, 2010, **Plaintiff DASRATH immediately complained once again to Defendant STRIANCE** about Defendant GIACOPELLI's continued discrimination, specifically that Defendant GIACOPELLI wrote a fabricated unsatisfactory evaluation about Plaintiff DASRATH solely due to his race and national origin. Unfortunately, Defendant STRIANSE completely ignored Plaintiff DASRATH's complaint and no action was taken, allowing Defendant GIOCAPELLI to continue his discrimination.

42. On or about May 28, 2010, Defendant GIOCAPELLI called Plaintiff DASRATH **"Monkey Shit"** and told him to **"go back to the jungles of Guyana."**

43. Defendants later provided Plaintiff DASRATH with copies of what purported to be his full Performance Evaluation, with various dates on them, including one that indicated the evaluation period was from October 5, 2009 to October 4, 2010, which was dated April 9, 2010 (approximately six (6) months before the end date of the review period).

44. On or about August 28, 2010, Defendant GIACOPELLI instructed Defendant VON BRAUN to order Plaintiff DASRATH out of the sterile I.V. room while in his sterile I.V. attire, and to bring the I.V.'s that Plaintiff DASRATH made into the regular pharmacy. However, to do that, Plaintiff DASRATH would have violated Defendants' sterility regulations. When Plaintiff DASRATH told Defendant VON BRAUN that it would violate the Defendants' sterility regulations, Defendant VON BRAUN proceeded to write Plaintiff DASRATH up for "insubordination."

45. On or about September 24, 2010, **Plaintiff DASRATH complained to Mr. Santo Barravecchio, Defendants' Labor Relations Manager**, about Defendant GIACOPELLI's and Defendant VON BRAUN's continued racial discrimination.

However, just like before, Defendants took no action in response to the complaint.

46. Since no one was doing anything to put an end to the pervasively hostile work environment, **on or about April 12, 2011, Plaintiff DASRATH, through his attorney, complained in writing to Defendants' President, Dr. Samuel Stanley**, about all of the harassment, discrimination, and disparate treatment to which he was being subjected.

47. While Plaintiff DASRATH was hoping that his complaint to Defendants' President would finally put an end to Defendant GIACOPELLI's and Defendant VON BRAUN's discrimination, he never expected Defendants to actively retaliate against him. However, this is exactly what occurred.

48. Not only did Defendants wholly fail to even respond to Plaintiff DASRATH's complaint, **but only two (2) weeks later, on or about April 29, 2011, without any warning and without even providing a reason, Defendant STRIANSE suddenly terminated Plaintiff DASRATH's employment.**

49. Plaintiff DASRATH's termination was **obviously discriminatory and blatantly in retaliation** for Plaintiff DASRATH's complaints, as his employment was terminated only two (2) weeks after the last time he complained of discrimination based on race and national origin.

50. It is rather apparent that Defendant GIACOPELLI actually used his authority over Plaintiff DASRATH to retaliate against him by making sure that Plaintiff DASRATH's employment was terminated.

51. Defendants obviously did not like the fact that Plaintiff DASRATH was from Guyana and had complained of discrimination, and thus began a discriminatory campaign against him, all in an effort to set Plaintiff DASRATH up for failure as a way to justify an otherwise

9

unlawful termination.

52. Based on Defendants' discriminatory and retaliatory treatment of Plaintiff DASRATH, as well as the aforementioned suspicious actions, it is clear that Defendants discriminated against, and terminated the employment of, Plaintiff DASRATH solely due to his race and national origin and in retaliation for complaining of race-based and national origin-based discrimination.

53. **Thus, on or about April 29, 2011, Defendants terminated Plaintiff DASRATH's employment due to his race and national origin and in retaliation for complaining of discrimination and retaliation.**

54. Plaintiff DASRATH felt offended, disturbed, and humiliated by the blatantly unlawful, discriminatory, and retaliatory termination.

55. **Defendants treated Plaintiff DASRATH different (discriminated against him) solely due to his Race (East Indian) and National Origin (Guyanese).**

56. **But for the fact that Plaintiff DASRATH had complained of discrimination, Defendants would not have treated him differently, and would not have terminated his employment.**

57. Unfortunately, Defendants never conducted any investigation, and in fact, no appropriate or reasonable action was ever taken regarding Defendants' blatant discrimination and retaliation. Defendants failed to take any action in response to Plaintiff DASRATH's complaints.

58. Plaintiff DASRATH was retaliated against due to his objection to Defendants' discriminatory and unlawful conduct.

59. Plaintiff DASRATH's performance was, upon information and belief, above average

10

     during the course of his employment with Defendants.

60. Plaintiff DASRATH has been unlawfully discriminated against, retaliated against, humiliated, and degraded, and as a result, suffers loss of rights, emotional distress, loss of income and earnings.

61. **Defendants' actions and conduct were intentional and intended to harm Plaintiff DASRATH.**

62. As a result of Defendants' actions, Plaintiff DASRATH feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

63. The above are just some of the acts of discrimination and retaliation that Plaintiff DASRATH experienced on a regular and continual basis while employed by Defendants.

64. As a result of the Defendants' discriminatory treatment of Plaintiff DASRATH, he has suffered severe emotional distress and physical ailments.

65. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further experienced severe emotional and physical distress.

66. As a result of the above, Plaintiff has been damaged in an amount in excess of the jurisdiction of the Court.

67. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands Punitive Damages as against all Defendants, jointly and severally.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
## (Not Against Individual Defendants)

68. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

69. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race and/or national origin.

70. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of his race and national origin.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
## (Not Against Individual Defendants)

71. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

72. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

73. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges

of employment because of his opposition to the unlawful employment practices of Defendants.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

74. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

75. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

76. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of his national origin and race.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

77. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

78. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

79. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because he opposed the unlawful employment practices forbidden under this

article.

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

80. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

81. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

82. Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

## JURY DEMAND

83. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964 and the New York State Executive Law §296 *et. seq.*, in that Defendants discriminated against Plaintiff on the basis of his race and national origin, and retaliated against Plaintiff for complaining of race-based and national origin-based discrimination;

B. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants'

14

unlawful discrimination and retaliation and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated: New York, New York
       July 20, 2012

                                      **PHILLIPS & PHILLIPS,**
                                      **ATTORNEYS AT LAW, PLLC**

                            By:    /s/_____
                                  Jesse C. Rose (JR 2409)
                                  Of Counsel
                                  *Attorneys for Plaintiff*
                                  30 Broad Street, 35th Floor
                                  New York, New York 10004
                                  (212) 248-7431
                                  jrose@tpglaws.com