UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ANAND DASRATH,

        Plaintiff,

    -against-

STONY BROOK UNIVERSITY MEDICAL CENTER,
PETER GIACOPELLI, KARL VON BRAUN,
JEANNENE STRIANSE,

        Defendants.
------------------------------------------------------------------X

**ORDER**
12-CV-1484 (SJF)(WDW)

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★  AUG 0 9 2013  ★

**LONG ISLAND OFFICE**

FEUERSTEIN, J.

    On March 27, 2012, plaintiff Anand Dasrath ("plaintiff") commenced this action against

his former employer, Stony Brook University Medical Center (the "Medical Center"), alleging

that he was discriminated against upon the basis of his national origin and race in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"). [Docket

Entry No. 1].[1] On July 24, 2012, plaintiff filed an amended complaint against the Medical

Center and his former supervisors, Peter Giacopelli, Karl Von Braun, and Jeannene Strianse (the

"individual defendants," and together with the Medical Center, "defendants"), asserting claims

pursuant to Title VII and Article 15 of the New York Executive Law (the "New York State

Human Rights Law") for: (1) discrimination in violation of Title VII (Count I) (against the

Medical Center only); (2) retaliation in violation of Title VII (Count II) (against the Medical

Center only); (3) discrimination in violation of New York Executive Law § 296(1) ("section

296(1)") (Count III) (against both the Medical Center and the individual defendants);

---

[1]    Plaintiff failed to serve the complaint on the Medical Center.

1

(4) retaliation in violation of New York Executive Law § 296(7) ("section 296(7)") (Count IV) (against both the Medical Center and the individual defendants); and (5) aiding and abetting discrimination in violation of New York Executive Law § 296(6) ("section 296(6)") (Count V) (against the individual defendants only). [Docket Entry Nos. 3-5] ("Am. Compl."). Now before the Court is defendants' motion to dismiss Count I in part and Counts II through V in their entirety for failure to state a claim upon which relief may be granted. [Docket Entry No. 16].[2] For the reasons that follow, defendants' motion is GRANTED IN PART and DENIED IN PART.

I. Background[3]

Plaintiff is of Guyanese national origin and East Indian race. Am. Compl. at ¶ 1. He was employed as a pharmacist at the Medical Center from October 5, 2006 to April 29, 2011 and worked the weekend night shift every Friday, Saturday and Sunday. Compl. at ¶ 7; Am. Compl. at ¶¶ 18, 31.

Plaintiff alleges that defendants discriminated against him upon the basis of his national

---

[2]    Defendants have also moved to dismiss the amended complaint against the individual defendants on the ground that plaintiff's method of service (serving the summons on the Medical Center's Risk Management Coordinator and mailing the summons to the Risk Management Coordinator's office in a sealed envelope marked "Personal & Confidential") was not "reasonably calculated" to apprise the individual defendants of the pendency of the action. Bossuk v. Steinberg, 58 N.Y.2d 916, 918-19 (1983). Defendants argue that "[d]elivery should have been to a person in [the Medical Center's] Pharmacy Department and the mailings should have been, but were not, addressed to the actual office of the individual defendants." Def. Memo. at 3. Defendants have failed to offer any support for their assertion that delivery of a summons to an individual defendant's place of business is deficient if the summons is not addressed to the defendant's particular office within the building. Therefore, the motion to dismiss the amended complaint against the individual defendants pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure is denied.

[3]    The factual allegations are taken from the amended complaint and are accepted as true for purposes of this motion.

2

origin and race by: (1) assigning him to work weekend night shifts every week while not assigning Caucasian pharmacists to work consecutive weekends, Am. Compl. at ¶ 31; (2) failing to give him a pay differential for working weekend night shifts while giving such a pay differential to other pharmacists, id. at ¶ 32; (3) failing to give him a bonus or salary increase at the end of 2010 while giving all other pharmacists a bonus and salary increase of between one and three thousand dollars ($1,000.00-$3,000.00), id. at ¶ 33; (4) only allowing him to perform "intravenous fluid preparations" while assigning other pharmacists "this difficult work for only portions of their shifts," id. at ¶ 34; (5) giving him a "fabricated unsatisfactory [performance] evaluation" in April 2010, id. at ¶ 41; and (6) terminating his employment in April 2011, id. at ¶ 48.

Plaintiff further alleges that Giacopelli, a Pharmacy Supervisor, Am. Compl. at ¶ 12, "engaged in . . . workplace sabotage . . . in an attempt to set [plaintiff] up for failure which [could be] then use[d] as an excuse to justify an otherwise unlawful termination," including by: (1) signing plaintiff in late for work even though he arrived on time, id. at ¶ 36; (2) tampering with tuberculin syringes and intravenous solutions prepared by plaintiff; and (3) refusing to believe plaintiff when he told Giacopelli that an intravenous solution prepared by Von Braun had expired, id. at ¶ 38. Plaintiff also alleges that Giacopelli made derogatory statements about his national origin, including that: (1) "Guyanese people were all Bucks who did not wear clothes," id. at ¶ 23; (2) Guyanese people "did not conduct marriage ceremonies," id.; (3) Guyanese people "did not have any formal education," id.; (4) "all Guyanese men would make babies and leave the scene," id.; (5) "people from the jungles of Guyana were [in]capable of working in a responsible job as an I.V. pharmacist," id. at ¶ 26; (6) plaintiff did not "belong[] here," id.; (7) Giacopelli "can step on [plaintiff] like a cockroach," id. at ¶ 27; and (8) "foreigners [like

3

plaintiff] create a lot of problems in our country," id. at ¶ 25. Also, "on a number of occasions" while plaintiff was eating lunch, Giacopelli asked him, "Is that jaguar meat you are eating? Did you kill the poor jaguar and eat its meat?" Id. at ¶ 28.

On October 9, 2009, plaintiff complained to Strianse, the "Director of Pharmacy," id. at ¶ 15, that Giacopelli was signing him in late for work when he arrived on time and was accusing him of eating jaguar meat, id. at ¶ 29.[4] Instead of addressing the allegations, Strianse called plaintiff "violent, insubordinate, and even used racial slurs against him." Id.

On April 9, 2010, Giacopelli and Von Braun summoned plaintiff to a meeting and presented him with the front page of his performance evaluation covering the period October 2008 to October 2009 and asked him to sign it. Id. at ¶ 39; [Docket Entry No. 16-3]. When plaintiff refused to sign, Von Braun prevented him from leaving the room by blocking the door. Id. at ¶ 40. On the same day, plaintiff complained to Strianse about Giacopelli's "continued discrimination" against him, including that Giacopelli "wrote a fabricated unsatisfactory evaluation about [him] solely due to his race and national origin." Id. at ¶ 41. Strianse ignored plaintiff's complaint and failed to take any action against Giacopelli. Id.

On or about May 28, 2010, Giacopelli called plaintiff "monkey shit" and told him to "go back to the jungles of Guyana." Id. at ¶ 42. On August 28, 2010, Giacopelli told Von Braun to order plaintiff out of the sterile I.V. room to deliver I.V.'s to the pharmacy. Id. at 44. When plaintiff refused to do so because it would violate the Medical Center's sterility regulations, Von Braun wrote plaintiff up for insubordination. Id. at ¶ 44.

On September 24, 2010, plaintiff complained about Giacopelli's and Von Braun's

---

4    It is not clear from the amended complaint whether plaintiff alleges that he told Strianse about Giacopelli's other conduct at this time. See Am. Compl. at ¶ 29.

conduct to Santo Barravecchio, the Medical Center's Labor Relations Manager, but no action was taken in response to the complaint. Id. at ¶ 45.

On April 12, 2011, plaintiff's attorney wrote a letter to the president of the Medical Center, Dr. Samuel Stanley, stating that plaintiff "recently heard through the grapevine that he [would] be terminated soon by Stonybrook [sic] because of an invalid evaluation of him in 2010" and arguing that "any termination of him would be unlawful" because: (1) he never received the evaluation; (2) he was deprived of his right to appeal the evaluation; (3) the evaluation was invalid because it was completed within six (6) months of the expiration of his term; and (4) "any notice of non-renewal [of his contract] based on the invalid evaluation would be a nullity." [Docket Entry No. 16-5] . The letter also stated that plaintiff "believes that the unfavorable evaluation and the apparent plan to terminate him as well as the related conduct of Stony Brook towards him constitute unlawful discrimination against him because of his race/national origin." Id.

On April 29, 2011, Strianse terminated plaintiff's employment "without any warning and without even providing a reason." Id. at ¶ 48.

Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a right to sue letter on December 29, 2011. Id. at ¶¶ 5-7.

II.     Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair

notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Looney v. Black, 702 F.3d 701, 719-20 (2d Cir. 2012); McGarry v. Pallito, 687 F.3d 505, 510 (2d Cir. 2012); Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679; see also Ruston v. Town Board for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) ("A court can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.") (quotations and citations omitted). Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120-21 (2d Cir. 2010); see also Matson v. Board of Education of City School District of New York, 631 F.3d 57, 63 (2d Cir. 2011) ("While a

6

complaint need not contain 'detailed factual allegations,' it requires 'more than an unadorned, the defendant-unlawfully-harmed-me accusation.'") (quoting Iqbal, 556 U.S. at 678).

The Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint relies heavily and which are, thus, rendered integral" to the complaint. Kleinman v. Elan Corp., plc, 706 F.3d 145, 147 (2d Cir. 2013); Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 123 (2d Cir. 2011); Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

III.    Analysis

A.    Exhaustion of Administrative Remedies

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003); see also, e.g., Hoffman v. Williamsville Sch. Dist., 443 F. App'x 647, 649 (2d Cir. 2011) ("Before filing a Title VII claim in federal court, a plaintiff must exhaust all available administrative remedies."); Fitzgerald v. Henderson, 251 F.3d 345, 358-59 (2d Cir. 2001) ("Title VII requires that an employment discrimination claimant pursue administrative procedures before commencing a lawsuit . . . ."). "If a claimant has failed to pursue a given claim in administrative proceedings, the federal court generally lacks jurisdiction to adjudicate that claim." Fitzgerald, 251 F.3d at 359. However, "[e]ven as to a claim not expressly pursued before the administrative agency," a federal court "has jurisdiction if that claim is 'reasonably related' to those that the plaintiff did assert before the agency." Id.; Deravin, 335 F.3d at 200-01 ("[C]laims that were not asserted before the EEOC may be pursued

in a subsequent federal court action if they are reasonably related to those that were filed with the agency.") (internal quotation marks omitted). A claim is deemed to be reasonably related to the EEOC charge "'if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" Ximines v. George Wingate High Sch., 516 F.3d 156, 158 (2d Cir. 2008) (quoting Fitzgerald, 251 F.3d at 359-60). The focus of this analysis is "'the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" Id. (quoting Deravin, 335 F.3d at 201).

Defendants argue that plaintiff has failed to exhaust the administrative remedies for his Title VII retaliation and hostile work environment claims because such claims were not included in his EEOC charge and are not reasonably related to the claims that were included. [Docket Entry No. 16-1] ("Def. Memo.") at 7.[5]

1.    Title VII Retaliation Claim

With respect to the retaliation claim, defendants note that the EEOC charge does not allege plaintiff ever complained about any discriminatory treatment and that the box on the form to indicate whether the charge is alleging retaliation was left blank. Id. at 7-8. Plaintiff argues in response that his attorney sent a letter to the Medical Center's president complaining about plaintiff's treatment shortly before his termination, and therefore any EEOC investigation would have uncovered the letter and "would have reasonably investigated to see if [p]laintiff's termination was in retaliation for that letter." Plaintiff's Memorandum of Law in Opposition to

---

[5]    Defendants have not moved to dismiss the Title VII disparate treatment claim against the Medical Center except insofar as it is premised upon a claim that plaintiff was subjected to a hostile work environment. The amended complaint does not expressly assert a hostile work environment claim, but the Court has assumed for purposes of this motion that such a claim was adequately pleaded.

Defendant's Motion to Dismiss [Docket Entry No. 17] ("Pl. Memo.") at 2.

"The scope of an EEOC investigation cannot reasonably be expected to encompass retaliation when [plaintiff] failed to put [the EEOC] on notice that [plaintiff] had engaged in the type of protected activity that is the predicate to a retaliation claim." O'Hara v. Mem'l Sloan-Kettering Cancer Ctr., 27 F. App'x 69, 70 (2d Cir. 2001) (summary order) (citing Fitzgerald, 251 F.3d at 366). Plaintiff's charge failed to alert the EEOC to the existence of the letter or to allege that plaintiff engaged in any protected activity, and therefore it failed to provide the EEOC adequate notice to investigate discrimination upon the basis of both retaliation and national origin or race. See Conkling v. Brookhaven Sci. Assocs., LLC, No. 10-CV-4164, 2012 WL 2160439, at *5 (E.D.N.Y. June 12, 2012) ("'[R]etaliation is a theory of liability that is substantively distinct from [an employment] discrimination claim[,]' [and a]ccordingly, a retaliation claim is not 'reasonably related' to an administrative charge simply because the charge asserts a discrimination claim, or refers to the fact that plaintiff suffered some adverse employment action.") (citations omitted) (quoting O'Hara v. Mem'l Sloan-Kettering Cancer Ctr., 27 App'x 69, 70-71 (2d Cir. 2001)); Morris v. David Learner Assocs., 680 F. Supp.2d 430, 437-38 (E.D.N.Y. 2010) ("[A] retaliation claim is not 'reasonably related' to the EEOC charge simply because the EEOC charge refers to the fact that plaintiff suffered an adverse employment action, such as termination.") (collecting cases); Shepheard v. City of N.Y., 577 F. Supp.2d 669, 680 (S.D.N.Y. 2008) ("Where the EEOC charge alleges discrimination but not retaliation, the reasonable scope of the agency's investigation cannot be expected to encompass allegations of retaliatory motive."); Gambrell v. Nat'l R.R. Passenger Corp., No. 01 Civ. 6433, 2003 WL 282182, at *8 (S.D.N.Y. Feb. 3, 2003) ("Where the EEOC charge alleges discrimination but not retaliation, the reasonable scope of the agency's investigation cannot be expected to encompass

allegations of retaliatory motive."). Therefore, the retaliation claim is not reasonably related to the EEOC charge, and plaintiff has failed to exhaust his administrative remedies. Accordingly, the Title VII retaliation claim (Count II) against the Medical Center is dismissed.

        2.     Title VII Hostile Work Environment Claim

According to defendants, "[n]othing in the EEOC Charge would have put the EEOC on notice that [plaintiff] had ever been harassed with respect to race or national origin." Def. Reply at 4. Defendants note that the EEOC charge "did not include any allegation that [plaintiff] was subjected to 'constant' or 'repeated' comments about the Guyanese, foreigners or jaguar meat, let alone to 'work place sabotage,'" and that the allegations in the charge relate only to claims of disparate treatment, not harassment. Def. Memo. at 9. Plaintiff argues in response that he provided "a layperson's account of a hostile work environment" in the EEOC charge by alleging that "administrators abused minorities, that he was given the most demanding jobs, and that someone wanted him out due to his race and national origin." Pl. Memo. at 3.

A hostile work environment in violation of Title VII is created "'[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "To give the EEOC adequate notice of a hostile work environment claim, the EEOC charge must reference 'repeated conduct or the cumulative effect of individual acts' directed toward the plaintiff." Morris, 680 F. Supp.2d at 437 (quoting Mathirampuzha v. Potter, 548 F.3d 70, 77 (2d Cir. 2008)). The EEOC charge alleges that, because of plaintiff's race and national origin, plaintiff was scheduled for weekend shifts, given the most demanding jobs, given negative performance evaluations, and terminated. Def. Memo.

Ex. A. The charge makes no reference to a hostile work environment and does not allege that plaintiff's supervisors made derogatory remarks or sabotaged his work. Therefore, the charge failed to provide the EEOC with notice to investigate whether plaintiff was subjected to the kind of pervasive intimidation, ridicule, and insult that could form the basis for a hostile work environment claim. See, e.g., Mathirampuzha, 548 F.3d at 77 (holding that the plaintiff failed to exhaust his administrative remedies where his EEO complaint "recounts nothing more than a single act of physical and verbal abuse" and "contains no reference to repeated conduct or the cumulative effect of individual acts"); Fleming v. Verizon N.Y., Inc., 419 F. Supp.2d 455, 464 (S.D.N.Y. 2005) (holding that the plaintiff's EEOC charge did not preserve her hostile work environment claim where the charge "ma[de] no reference to a sexually hostile work environment" but claimed, inter alia, "that 'women suffer blatant discrimination as male colleagues and supervisors alike, treat women different from their male counterparts'"); see also Butts v. City of N.Y. Dep't of Housing, 990 F.2d 1397, 1403 (2d Cir. 1993) ("Were we to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response, to define the scope of the EEOC investigation and thereby predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and Title VII's investigatory and mediation goals would be defeated."), superseded on other grounds by 42 U.S.C. § 1981(b). Accordingly, to the extent that Count I is premised upon a Title VII hostile work environment claim, plaintiff failed to exhaust his administrative remedies, and the claim is dismissed.

B.    Eleventh Amendment Immunity

"The Eleventh Amendment states that '[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'"

<u>Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.</u>, 466 F.3d 232, 236 (2d Cir. 2006)

(quoting U.S. Const. amend. XI). "The Amendment is rooted in a recognition that the States,

although a union, maintain certain attributes of sovereignty, including sovereign immunity, and it

is inherent in the nature of sovereignty not to be amenable to the suit of an individual without the

sovereign's consent." <u>Id.</u> (internal quotation marks, citations and alterations omitted). "The

Eleventh Amendment has been interpreted as also barring suits in federal court against a state

brought by that state's own citizens." <u>Mary Jo C. v. N.Y. State & Local Ret. Sys.</u>, 707 F.3d 144,

151 (2d Cir. 2013). Therefore, "as a general rule, state governments may not be sued in federal

court unless they have waived their Eleventh Amendment immunity." <u>Woods</u>, 466 F.3d at 236

(citing <u>Lapides v. Bd. of Regents</u>, 535 U.S. 613, 618-19 (2002)). "'[T]he immunity recognized

by the Eleventh Amendment extends beyond the states themselves to state agents and state

instrumentalities that are, effectively, arms of a state." <u>Mary Jo C.</u>, 707 F.3d at 151-52 (quoting

<u>Woods</u>, 466 F.3d at 236) (internal quotation marks omitted).

     Defendants argue that the claims against the Medical Center asserted pursuant to New

York law are barred by the Eleventh Amendment. Defendants note that the State University of

New York, of which the Medical Center is a part, has been held to be "an integral part of the

government of the State," <u>Dube v. State Univ. of N.Y.</u>, 900 F.2d 587, 594 (2d Cir. 1990)

(internal quotation marks omitted), and that the Eleventh Amendment has been held to bar

claims under the New York State Human Rights Law against state agencies in federal court, <u>see,</u>

<u>e.g., Anand v. State Dep't of Taxation & Fin.</u>, No. 10-CV-5142, 2012 WL 2357720, at *4-5

(E.D.N.Y. June 13, 2012); <u>Lambert v. N.Y. State Office of Mental Health</u>, No. 97-CV-1347,

2000 WL 574193, at *7 (E.D.N.Y. Apr. 24, 2000) ("As district courts in this circuit have

uniformly found, the New York Human Rights Law includes no waiver of the state's immunity

12

to suit in federal court.").

Plaintiff has failed to respond to this argument and appears to consent to dismissal of these claims. See Pl. Memo. at 8. Therefore, the state law claims against the Medical Center are deemed abandoned and are dismissed.

C.     New York State Law Claims Against the Individual Defendants

1.     Section 296(1) - Discrimination

Section 296(1) provides that "[i]t shall be an unlawful discriminatory practice: (a) For an employer . . . , because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." " [A]n individual is properly subject to liability for discrimination [under section 296(1)] when that individual qualifies as an 'employer.'" Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 57 (2d Cir. 2012); see also Anand, 2012 WL 2357720, at *10. "An individual qualifies as an 'employer' when that individual has an ownership interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'" Townsend, 679 F.3d at 57 (quoting Patrowich v. Chem. Bank, 483 N.Y.S.2d 659, 661 (1984) (per curiam)). Defendants argue that the section 296(1) claims against the individual defendants must be dismissed because plaintiff has failed to allege facts demonstrating that any of the individual defendants qualifies as an "employer" under the statute.

Plaintiff has alleged that Strianse, as "Director of Pharmacy," had supervisory authority over him and the other individual defendants, see Am. Compl. at ¶ 15, and that she was responsible for plaintiff's termination in April 2011, id. at ¶ 48. Although discovery may

13

establish that Strianse was only executing the decision of her supervisors in the Medical Center and therefore does not qualify as an employer under section 296(1), plaintiff's allegations are sufficient to state a plausible claim that she had the "power to do more than carry out personnel decisions made by others." Patrowich, 483 N.Y.S.2d at 661. See Emmons v. City Univ. of N.Y., 715 F. Supp.2d 394, 421 (E.D.N.Y. 2010) ("[S]ince Jackson was the President of MEC, a reasonable inference can be drawn from the complaint that he had the power to hire and fire [the plaintiff]."). Therefore, defendants' motion to dismiss the section 296(1) claim against Strianse is denied.

According to plaintiff, he has alleged that Strianse's decision to terminate him "was made in concert" with Giacopelli and, although Von Braun "is not alleged to have a specific role in Plaintiff's termination, it is implied that he played a role in making that decision," and therefore both Giacopelli and Von Braun may also be held liable as "employers" under section 296(1). Pl. Memo. at 4 (citing Am. Compl. at ¶ 50). The allegations in the amended complaint, even if true, demonstrate only that Giacopelli and Von Braun had the power to supervise plaintiff in his daily duties and to evaluate his performance, not that they had the power to independently carry out personnel decisions regarding him, such as his rate of pay, schedule or termination.[6] Allowing

---

[6] Defendants assert that the power to hire and fire is necessary to impose liability under section 296(1) and that other supervisory power over the terms and conditions of employment is not sufficient. See Def. Memo. at 11; Def. Reply at 5-6. Defendants have not cited persuasive authority for this proposition, see Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Emmons, 715 F. Supp.2d at 420, and several courts have instead adopted an "economic reality" test, considering whether the defendant "(1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; or (4) maintained employment records." Alexander v. Westbury Union Free Sch. Dist., 829 F. Supp.2d 89, 114 (E.D.N.Y. 2011) (citing Maher v. Alliance Mortg. Banking Corp., 650 F. Supp.2d 249, 260 (E.D.N.Y. 2009); Dantuono v. Davis Vision, Inc., No. 07-CV-2234, No. 07-CV-2234, 2009 WL 5196151, at *10 (E.D.N.Y. Dec. 29, 2009); but see

the section 296(1) claim to proceed against Giacopelli and Von Braun upon the basis of the allegation that they "played a role" in plaintiff's termination by supervising and evaluating him would disregard the decision of the New York State Legislature to apply section 296(1) only to "employer[s]" and not to all supervisors. See Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995) (holding that the plaintiff's section 296(1) claim against an individual defendant must be dismissed where no evidence was presented to indicate that "he could hire or fire" the plaintiff and, although he had "supervisory control over [the plaintiff's] worksite . . . enabl[ing] him to review and comment on [the plaintiff's] performance," a different supervisor had the authority to make assignments and other personnel decisions), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).[7] Therefore, the section 296(1) claims against Giacopelli and Von Braun are dismissed.

---

Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp.2d 344, 355-56 (N.D.N.Y. 2010) ("The 'power to do more than carry out personnel decisions made by others' essentially amounts to the authority 'to do more than carry out personnel decisions made by others' essentially amounts to the authority 'to hire or fire' people.") (citing Tomka, 66 F.3d at 1317)). However, plaintiff does not allege that Giacopelli and Von Braun controlled his work schedule and employment conditions or determined his rate of pay, see Maher, 650 F. Supp.2d at 260, but rather bases his argument for holding them liable under section 296(1) entirely upon their evaluation of his performance and alleged involvement in his termination. See Pl. Memo. at 4. Therefore, plaintiff's allegations against Giacopelli and Von Braun are inadequate under either test, and it is not necessary for the Court to determine here whether supervisory power short of the power to hire and fire may be sufficient to sustain a claim under section 296(1).

[7]     Furthermore, as discussed in further detail below, a separate section of the New York Human Rights Law, section 296(6), "allow[s] a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' to be held liable," even if the co-worker lacks the authority to independently carry out personnel decisions. Feingold v. New York, 366 F.3d 138, 157-58 (2d Cir. 2004) (quoting Tomka, 66 F.3d at 1317). The distinction between section 296(1) and section 296(6) would be eliminated if a section 296(1) claim could be stated by alleging that the defendant supervised the plaintiff but did not independently make the allegedly discriminatory personnel decisions. See Erin Estates, Inc. v. McCracken, 921 N.Y.S.2d 730, 732 (App. Div. 2011) ("A statute or ordinance is to be construed as a whole, reading all of its parts together to determine the legislative intent and to avoid rendering any of its language superfluous.").

2.    Section 296(7) - Retaliation

Section 296(7) provides that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." "The anti-retaliation provisions in Title VII . . . and the [New York State Human Rights Law] contain nearly identical language and are analyzed under the same framework." Shih v. JPMorgan Chase Bank, N.A., No. 10 Civ. 9020, 2013 WL 842716, at *5 (S.D.N.Y. Mar. 7, 2013); Germain v. Cnty. of Suffolk, No. 07-CV-2523, 2009 WL 1514513, at *8 (E.D.N.Y. May 29, 2009). "To state a claim for retaliation . . . , a plaintiff must plead facts that would tend to show that: (1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (citing Feingold, 366 F.3d at 156).

Defendants argue that plaintiff cannot assert a retaliation claim upon the basis of his letter dated April 12, 2011 to Dr. Stanley, the president of the Medical Center, because the letter itself indicates that plaintiff was aware that the decision not to renew his contract had already been made and that his termination was imminent. Def. Memo. at 13. In response, plaintiff asserts that at the time the letter was sent he "was not certain that he was being terminated" and that "[i]f there was no plan to terminate Plaintiff at the time that the April 12, 2011 letter was sent, then Plaintiff's termination was caused by the April 12, 2011 letter." Pl. Memo. at 4-5.

The amended complaint, taken as a whole, does not state a plausible claim of retaliation upon the basis of the letter to Dr. Stanley. Despite plaintiff's assertion that he was not "certain"

16

that he was being terminated, his own statements indicate that the decision not to renew his contract had been made before the letter was sent and that plaintiff was aware of the decision. See Def. Memo. Ex. C ("Mr. Dasrath has recently heard through the grapevine that he will be terminated soon by Stonybrook [sic] because of an invalid evaluation of him in 2010 . . . ."); Def. Memo. Ex. A at 36 ("Through the 'Grapevine' I have been informed that my employment at Stony Brook University Medical Center will soon be terminated for non-renewal of contract."). Furthermore, given that the derogatory remarks, "sabotage" and negative performance evaluation (which plaintiff alleges was the basis for his termination) all allegedly occurred before the letter was sent, the fact that the letter happened to be sent two (2) weeks prior to plaintiff's termination does not give rise to an inference of retaliation.

Defendants also argue that plaintiff cannot assert a retaliation claim upon the basis of his complaints to Strianse on October 9, 2009 and April 9, 2010 because the complaints were remote from any adverse employment action and therefore "fail to satisfy the causal connection requirement." Def. Memo. at 14; Def. Reply at 8-9. Plaintiff argues in response that: (1) his complaint on October 9, 2009 was not remote from either the negative performance review he received on April 9, 2010 or the denial of a bonus and salary increase at the end of 2010 because these actions were "the first opportunit[ies] Defendants had to discriminate against him" after his complaint, Pl. Memo. at 5 (citing Am. Compl. at ¶¶ 33, 39-40); and (2) he received a retaliatory discipline for insubordination on August 28, 2010, which plaintiff (presumably) asserts is not remote from his complaint on April 9, 2010, id. (citing Am. Compl. at ¶ 44).[8]

Plaintiff's complaints to Strianse do not give rise to an inference of retaliation. Six (6)

<hr>

[8]      Plaintiff also mentions in his response to defendants' argument that he complained to defendants' Labor Relations Manager on September 24, 2010 but fails to connect this complaint with any alleged adverse employment action. See Pl. Memo. at 5.

months elapsed between his complaint on October 9, 2009 and the negative performance review in April 2009, and approximately fifteen (15) months elapsed between the complaint and the denial of his bonus and salary raise at the end of 2010, and there are no allegations that support a causal connection between these remote events. Plaintiff asserts that a causal connection may be inferred despite the lack of temporal proximity because defendants did not have an opportunity to discriminate against him prior to the performance review and the end of 2010. However, this assertion is belied by the fact that defendants could have denied plaintiff a bonus and salary raise at the end of 2009 but did not.

Likewise, there is no basis to infer that Von Braun's write-up of plaintiff for insubordination in August 2010 was in retaliation for plaintiff's April 2010 complaint to Strianse. Plaintiff acknowledges that he refused to comply with Von Braun's directions, see Am. Compl. at ¶ 44, and fails to allege any facts to support his assertion that the incident was motivated by retaliation or involved anything more than a dispute over the Medical Center's sterility regulations. Furthermore, more than four (4) months elapsed between plaintiff's complaint to Strianse and his dispute with Von Braun, and given that Von Braun and plaintiff interacted on a regular basis during that time, the lack of a temporal connection undermines any inference of causation. Accordingly, plaintiff's section 296(7) claims against the individual defendants are dismissed.

### 3. Section 296(6) - Aiding and Abetting

Section 296(6) provides that it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." The Second Circuit has held that this statute "allow[s] a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' to be held liable under

the [New York State Human Rights Law] even though that co-worker lacked the authority to either hire or fire the plaintiff." Feingold, 366 F.3d at 158 (quoting Tomka, 66 F.3d at 1317). Defendants argue that the section 296(6) claims against the individual defendants must be dismissed because "[t]he Amended Complaint does not clearly allege which, if any, of the individual defendants aided, abetted, incited, compelled or coerced a discriminatory act, or how each individual defendant did so." Def. Memo. at 15. Plaintiff has responded to this argument by repeating the allegations in the amended complaint against each individual defendant and stating, in conclusory fashion, that the conduct constituted the aiding and abetting of discrimination. See Pl. Memo. at 6-8.

The amended complaint "fail[s] to set forth the basis for plaintiff's [s]ection 296(6) claim against each individual defendant," i.e., the conduct by the individual defendant that allegedly constituted aiding and abetting and the exact violation that the conduct is alleged to have aided and abetted, Anand, 2012 WL 2357720, at *10, and plaintiff's response to the motion fails to offer any clarification. Furthermore, without more specific allegations, the Court cannot determine whether defendants are correct that at least some of the section 296(6) claims must be dismissed because "recent intermediate appellate state court decisions . . . hold that an individual cannot be held liable for aiding and abetting his own violation of the [New York State Human Rights Law]." Def. Reply at 12;[9] see also Alexander v. Westbury Union Free Sch. Dist., 829 F. Supp.2d 89, 115 (E.D.N.Y. 2011) (expressing doubt that an individual defendant may be held

---

[9]     Given the lack of specific allegations supporting plaintiff's aiding and abetting claims, it is not necessary for the Court to determine at this time whether defendants are correct that these recent state court decisions are consistent with the Second Circuit's holding in Tomka, 66 F.3d at 1317. See Anand, 2012 WL 2357720, at *10 ("Although the Tomka decision is 'not without controversy, . . . until the Second Circuit revisits the issue, Tomka is the law in this circuit.'") (omission in original) (quoting Maher v. Alliance Mortg. Banking Corp., 650 F. Supp.2d 249, 262 (E.D.N.Y. 2009)).

liable for aiding and abetting herself or that the Second Circuit's holding in Tomka, 66 F.3d at

1317, requires such a result). Therefore, plaintiff has failed to adequately plead a section 296(6)

claim against any of the individual defendants, and the claims are dismissed.

      D.    Leave to Amend

      Plaintiff requests that, to the extent defendants' motion is granted, the Court grant him

"leave to file a Second Amended Complaint to address [the Court's] concerns with additional

allegations which would provide more specific information." Pl. Memo. at 8. Rule 15(a) (2) of

the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when

justice so requires." However, "leave to amend may be denied when such amendment would be

futile." Newby v. Bank of America Corp., No. 12-CV-614, 2013 WL 940943, at *9 n.9

(E.D.N.Y. Mar. 8, 2013) (quoting Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC,

No. 11-CV-3327, 2013 WL 417406, at *21 (E.D.N.Y. Feb. 4, 2013)).

      Leave to amend would be futile with respect to the claims dismissed due to plaintiff's

failure to exhaust his administrative remedies and the Medical Center's Eleventh Amendment

immunity. Plaintiff has also failed to offer any reason for the Court to conclude that a second

amended complaint would demonstrate that Von Braun and Giacopelli were "employers" under

section 296(1) or that there are factual allegations sufficient to support an inference of retaliation.

Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 89 (2d Cir. 1999) (affirming the district

court's denial of leave to amend the complaint where, inter alia, "there [was no] showing as to

how plaintiffs might amend their complaint to cure their pleading deficiencies, especially in light

of the insufficiency of facts to support a claim"). Therefore, leave to amend with respect to these

claims (Counts I, II, III, and IV) is denied.

      With respect to the section 296(6) claim against Von Braun, plaintiff only alleges that

20

Von Braun was present at the meeting where plaintiff received his negative performance evaluation and that he wrote plaintiff up for insubordination. Neither of these allegations demonstrate that Von Braun had any involvement, even as an aider or abettor, in the personnel decisions that form the basis for plaintiff's discrimination claims, and plaintiff has failed to offer any reason for the Court to conclude that this deficiency can be remedied in a second amended complaint. Therefore, leave to amend the section 296(6) claims against Von Braun is denied.

However, the Court cannot conclude upon the basis of the amended complaint that any attempt to amend would be futile with respect to the section 296(6) claims against Strianse and Giacopelli. **Therefore, plaintiff is granted leave to, if he so chooses, file an amended complaint in accordance with this order by August 30, 2013 at 5:00 p.m.**

IV.    Conclusion

For the foregoing reasons, defendants' motion [Docket Entry No. 16] is granted in part and denied in part: (1) Count I is dismissed with prejudice insofar as it is premised upon a hostile work environment claim; (2) Count II is dismissed with prejudice; (3) Count III is dismissed with prejudice insofar as it is asserted against the Medical Center, Von Braun and Giacopelli; (4) Count IV is dismissed with prejudice; and (5) Count V is dismissed with prejudice insofar as it is asserted against Von Braun and without prejudice insofar as it is asserted against Strianse and Giacopelli.

The parties are referred to Magistrate Judge William D. Wall to conduct discovery on the Title VII discrimination claim against the Medical Center and the section 296(1) claim against Strianse. The Court will hold a pretrial conference on December 19, 2013 at 11:15 a.m., by which time all discovery must be completed.

**SO ORDERED.**

s/ Sandra J. Feuerstein

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: August 9, 2013
         Central Islip, New York